Filed 10/17/25 (reposting correct version)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAVE OUR ACCESS, | D084132 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2022-00035094-CU-TT-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Reversed.

DeLano & DeLano, Everett L. DeLano III and Ezgi Kuyumcu for Plaintiff and Appellant.

Mara W. Elliott and Heather Ferbert, City Attorneys, M. Travis Phelps, Assistant City Attorney, and Benjamin P. Syz, Deputy City Attorney, for Defendant and Respondent.

# INTRODUCTION

This appeal challenges the City of San Diego's 2022 approval of a second ballot measure to exclude the Midway-Pacific Highway Community Planning area (Midway-Pacific Highway area) from San Diego's Coastal Height Limit Overlay Zone, which generally limits building heights to 30 feet.

We previously affirmed a judgment invalidating the first ballot measure approved in 2020 because the City did not consider important potential environmental impacts of removing the height limit in the Midway-Pacific Highway area, as required by the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.[1]) (CEQA). (*Save Our Access v. City of San Diego* (2023) 92 Cal.App.5th 819, 829–830 (*Save Our Access*).) For that ballot measure, we concluded the City could not rely on the program environmental impact report prepared in 2018 (PEIR) for the Midway-Pacific Highway Community Plan Update (MPH CPU) because removing the height limit was "a significant change that was not considered" in the program document. (*Id.* at p. 859.)

While that appeal was pending, the City prepared a supplemental environmental impact report (SEIR) and approved a second ballot measure to remove the height limit from the same area. When we inquired about whether these actions rendered the prior appeal moot, both parties asked us to decide the merits of the appeal then before us. (*Save Our Access, supra,* 92 Cal.App.5th at p. 829, fn. 3.) The City said the SEIR and ballot measure

---

[1] Undesignated statutory references are to the Public Resources Code unless we state otherwise.

were separate actions for a distinct project that was being challenged by a new lawsuit—this one. Save Our Access had filed new litigation contending the City's actions still failed to comply with CEQA.[2]

The superior court ultimately denied Save Our Access's petition for writ of mandate related to the second ballot measure. Save Our Access appealed.

The issue before us now is limited: whether the City complied with the CEQA requirements to adequately inform the public of the potential environmental impacts of approving the *second* ballot measure to remove the height limit in the Midway-Pacific Highway area, to identify possible mitigation measures, and to disclose the reasons for approving removal of the height limit even if there are significant environmental impacts. We conclude it did not.

The City's initial study and SEIR adopted the 2018 PEIR analysis without actually considering the environmental impacts of buildings greater than 30 feet, other than views and neighborhood character. This was inadequate. As a result, neither the City decisionmakers nor the public were able to make a meaningful decision about the second ballot measure.

Recent legislative changes to CEQA do not alter our analysis. We invited the parties to submit supplemental briefs addressing whether any changes to CEQA from recently enacted Assembly Bill No. 130 and Senate Bill No. 131 impact the issue presented in this appeal. Save Our Access responded by saying the recent amendments do not appear to affect

---

[2] Save Our Access describes itself as "a non-profit corporation that seeks to support the quality of life in Southern California by advocating for public access to beaches, parks, water, and public land and for creating more parkland."

3

this appeal, but are focused on "obligations agencies must undertake regarding individual projects." The City did not respond. We conclude removal of the height limit for an entire planning area is not encompassed by the recently enacted CEQA exceptions identified by the Legislature.

We, therefore, reverse and remand with directions to grant Save Our Access's petition for writ of mandate and to direct the City to comply with CEQA.

## II.

## BACKGROUND

A. *Background of Midway-Pacific Highway Community and Prior Appeal*[3]

Briefly, San Diego voters passed an ordinance in 1972 prohibiting construction of or additions to buildings higher than 30 feet " 'within the Coastal Zone of the City of San Diego,' " which is defined as " 'that land and water area of the City of San Diego from the northern city limits, south to the border of the Republic of Mexico, extending seaward to the outer limit of City jurisdiction and extending inland to the location of Interstate [Highway] 5 on January 1, 1971' " (Coastal Zone). (*Save Our Access, supra*, 92 Cal.App.5th at pp. 829–830.) The ordinance, codified at San Diego Municipal Code as section 132.0505, excludes the downtown area of San Diego and a few other specific projects allowed by subsequent voter initiatives.

The arguments in favor of the 1972 initiative included maintaining access to beaches, preserving the nature and character of coastal communities, and preventing high-rise buildings from obstructing " 'needed

---

[3] We incorporate by reference the detailed historical background of the Midway-Pacific Highway area and the height limit ordinance described in our prior opinion. (*Save Our Access, supra*, 92 Cal.App.5th at pp. 829–832.)

4

ocean breezes, sky and sunshine.' " (*Save Our Access, supra*, 92 Cal.App.5th at p. 830.)  It also sought to provide " ' "protection against unwanted high population density with its problems of congestion, lack of parking space, increased crime rate, noise, air pollution, inadequate public utilities and increased taxes." ' " (*Ibid.*)

In 2018, the City approved the MPH CPU along with amendments to the general plan.  The land use goals of the MPH CPU included "developing a 'vibrant, balanced, and pedestrian-oriented community that provides residential, commercial, office, industrial, institutional, military, and civic uses' using a 'compatible mix of land uses that support active transportation and a healthy environment' and a 'variety of housing types for all age, income, and social groups.' " (*Save Our Access, supra*, 92 Cal.App.5th at p. 832.)  The MPH CPU rezoned some areas within the Midway-Pacific Highway area with City-wide zoning designations and adopted new zoning designations, including a mixed commercial residential land use designation. (*Ibid.*)

The 2018 MPH CPU and the supporting PEIR were prepared with the understanding that the 30-foot height limit applied to the area.  (*Save Our Access, supra*, 92 Cal.App.5th at p. 855.)  The scoping statement for the PEIR informed the public that the Coastal Zone " 'applies to the entire Midway-Pacific Highway community,' which 'limits construction of new development to 30-feet in height to protect coastal views.' " (*Save Our Access, supra*, 92 Cal.App.5th at p. 831.)  The final MPH CPU also stated the Coastal Zone " 'limits the height of new buildings to protect coastal views.' " (*Id.* at p. 832.)

In 2020, the City approved the first ballot measure asking the voters to exclude the Midway-Pacific Highway area from the 30-foot height limit.  In invalidating the 2020 ballot measure for failure to comply with CEQA, the

5

superior court identified the failure to address the impact of taller buildings on scenic views and vistas. However, the court expected the City would analyze other potential environmental impacts associated with removing the height limit. (*Save Our Access, supra*, 92 Cal.App.5th at p. 841.)

We affirmed the superior court's judgment and rejected the City's claim that the 2018 PEIR for the MPH CPU addressed potential environmental impacts of removing the height limit. We concluded the City was required by CEQA to conduct further analysis to consider "potential issues related to building heights above 30 feet." (*Save Our Access, supra*, 92 Cal.App.5th at pp. 861–862.)

B. *2022 SEIR and Second Ballot Measure*

During the prior appeal, the City prepared a draft SEIR for a second ballot measure. The draft SEIR acknowledged removal of the Coastal Zone height limit was a changed circumstance. But the draft SEIR only addressed visual effects and neighborhood character as potentially unexamined impacts of removing the 30-foot height limit. The initial study stated "all other environmental impact areas analyzed in the 2018 PEIR adequately addressed" the removal of the height limit.

Save Our Access and others submitted public comments stating the analysis of potential environmental impacts in the draft SEIR was still inadequate.

Nevertheless, in July 2022, the City certified the SEIR, adopted a statement of overriding considerations, and adopted the second ballot measure for the November 2022 ballot to exclude the Midway-Pacific Highway area from the Coastal Zone height limit.

6

Save Our Access challenged the validity of the second ballot measure by a petition for writ of mandate alleging the City failed to comply with CEQA procedural requirements for: (1) tiering a later analysis from a program EIR, (2) preparing an adequate subsequent EIR, and (3) examining effects not examined in the prior program EIR. It also alleged the City failed to adopt feasible mitigation measures and alternatives as required by CEQA and that City failed to adopt findings supported by substantial evidence. Save Our Access contended that the voters were not told of the significant environmental effects of removing the height limit since the 2018 PEIR did not consider removal of the height limit.

Save Our Access pointed to public comments about unexamined potentially significant environmental impacts such as water quality, air quality, earthquake, and liquification, among other issues. Save Our Access submitted a letter from a technical consulting firm opining that the draft SEIR did not sufficiently consider or evaluate the air quality and greenhouse gas impacts of increased building height.

The City contended the 2022 ballot measure to remove the height limit is different from the 2020 ballot measure because the City completed "a new environmental review" and prepared an SEIR analyzing significant impacts based on "an entirely different administrative record." The SEIR addressed only significant impacts on visual effects and neighborhood character because the initial study determined the PEIR adequately analyzed all other potential impacts.

The superior court denied the petition and entered judgment in favor of the City. Save Our Access appealed.

III.

DISCUSSION

A. *General Principles*

CEQA "and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' " (*Tomlinson, supra*, 54 Cal.4th at pp. 285–286, quoting Cal. Code Regs., tit. 14, § 15002; hereafter Guidelines[4].) "CEQA was intended to be interpreted in such a manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (Guidelines, § 15003, subd. (f).)

CEQA defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" which is undertaken by a public agency or a person supported from a public agency or "involves the issuance

---

[4]   We use "Guidelines" to refer to the Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.).

8

to a person of a lease, permit, license, certificate, or other entitlement for use" by a public agency.  (§ 21065.)

The parties agree a ballot measure initiated and approved by a public entity is a "project" subject to CEQA.  (*Save Our Access, supra*, 92 Cal.App.5th at p. 846.)  The parties do not contend recently enacted CEQA exemptions apply to the ballot measure before us.

If a project is not subject to an exemption, the lead agency conducts an initial study to determine whether the project may have a significant impact on the environment.  (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380; Guidelines, §§ 15063, subd. (a), 15002, subd. (k)(2).)  "If the administrative record before the agency contains substantial evidence that the project may have a significant effect on the environment . . . it must go to on the third stage of the CEQA process: preparation and certification of an [environmental impact report].  (§§ 21100, 21151; Guidelines, §§ 15002, subd. (k)(3), 15063, subd. (b)(1), 15064, subds. (a)(1), (g)(1), 15362.)"  (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1372.)

"The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided."  (§ 21002.1, subd. (a).)  The Legislature requires public agencies to "mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so."  (§ 21002.1, subd. (b).)

The environmental impact report (EIR) is the "heart" of CEQA. (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 713.)  It serves to inform the responsible agency and the public about the

9

potential significant environmental impacts of the proposed project so they can make a reasoned judgment as to whether and how to proceed with the project. (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627; Guidelines, § 15003, subd. (d).) "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 405 (*Laurel Heights*).)

We will reverse an agency's determination regarding CEQA compliance only where "there was a prejudicial abuse of discretion." (§ 21168.5; *Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) We review these two types of errors differently. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) "[W]e determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements.'" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho* Cordova (2007) 40 Cal.4th 412, 435.) In reviewing for substantial evidence, "we accord greater deference to the agency's substantive factual conclusions." (*Ibid.*) "[T]he reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.'" (*Ibid.*)

Determining whether an agency followed proper procedures is not always easy "when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' " (*Sierra Club, supra*, 6 Cal.5th at p. 513.)  In some instances, "the agency's discussion of significant project impacts may implicate a factual question that makes substantial evidence review appropriate. . . . [b]ut whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question.  A conclusory discussion of an environmental impact . . . can be determined by a court to be inadequate as an informational document without reference to substantial evidence." (*Id.* at p. 514.)  This is true whether the alleged inadequacy is "the complete omission of a required discussion or a patently inadequate . . . discussion devoid of analysis, the reviewing court must decide wither the EIR serves its purpose as an informational document." (*Id.* at p. 516.)

B.  *The 2022 SEIR Was Inadequate*

    1.  *The 2018 PEIR Did Not Consider Impacts of Building Heights Above 30 Feet*

The superior court's 2022 judgment invalidating the first ballot measure and directing further CEQA analysis did not limit the review to scenic vistas and views.  It " 'anticipated such environmental review will analyze the potential other impacts associated with' " removing the height limit.  (*Save Our Access, supra*, 92 Cal.App.5th at p. 841.)

The City's initial study and 2022 SEIR did not meet this expectation.  Instead, the City focused on impacts to visual effects and neighborhood

11

character as the only environmental resources that "would be potentially affected by the project and would involve at least one significant impact that substantially exceeds or is otherwise outside the scope of activities evaluated for potential environmental effects in the 2018 PEIR."

The initial study said the "2018 PEIR comprehensively addressed the potential environmental effects of buildout of the 2018 Community Plan *but did not include removal of the 30-foot height limit as part of the plan*." (Italics added.) The 2022 draft SEIR recognized removal of the Coastal Zone height limit was a changed circumstance from the 2018 PEIR.

Yet, for almost every category of potential environmental impacts the initial study addressed, it said the PEIR adequately examined potential impacts because the project "would be limited to the CP area footprint and land use, density, and zoning analyzed in the 2018 PEIR. The removal of the 30-foot height restriction would not result in a change to total allowable density buildout in the CP area and would not change the underlying base zone regulations, including the base zone's height limit." The draft SEIR, in turn, addressed only visual effects and neighborhood character, relying on the initial study's declaration that "all other environmental impact areas analyzed in the 2018 PEIR adequately addressed" removal of the height limit. This conclusion is not supported by substantial evidence and fails to comply with the procedural requirements of CEQA.

The repeated comments throughout the initial study that "removal of the 30-foot height restriction . . . would not change the underlying base zone regulations, *including the base zone's height limit*" (italics added), suggests the PEIR considered environmental impacts of buildings above 30 feet as allowed by the underlying base zone regulations. It did not.

12

As we explained in our prior opinion, the 2018 MPH CPU and the supporting PEIR were prepared with the understanding that the 30-foot height limit *applied* to the area. (*Save Our Access, supra*, 92 Cal.App.5th at p. 855.)

The PEIR's analysis of "allowable density buildout" of the MPH CPU assumed maximum *dwelling units* allowed by the base zones. The PEIR assumed traffic volume and greenhouse gas emissions based on dwelling units. Although the PEIR mentioned maximum building heights in charts describing base zone regulations, the PEIR *did not* actually analyze potential impacts of building heights above 30 feet on environmental resources. (*Save Our Access, supra*, 92 Cal.App.5th at pp. 852–853.) Rather, the PEIR described the Midway-Pacific Highway area as flat with low-lying topography with multi-family housing generally in the form of two-story apartment complexes, consistent with the height limit.

The removal of the height limit is a *significant* change to the Midway-Pacific Highway area. Without the limit, the MPH CPU would permit buildings of 100 feet and higher in four zones with no height limit, each of which are placed along Interstate 8 on the north and Interstate 5 on the east. On the west, buildings ranging from 40 to 65 feet high will border the neighboring community. A small area near the Marine Corps Recruit Depot is zoned for residential multi-family units and is limited to 30 feet, but this is surrounded by allowable building heights ranging from 45 to over 100 feet.

13

## Table 3-1. CP Area Maximum Height Limits

| Village, District, or Area | Zoning Designation[1] | Maximum Height Limit per the SDMC |
|---|---|---|
| Sports Arena Community Village | CC-3-6 | 65 feet |
| | RM-3-8 | 50 feet |
| Kemper Neighborhood Village | RM-2-5 | 40 feet |
| | RM-3-8 | 50 feet |
| | CC-1-3 | 45 feet |
| | CC-3-6 | 65 feet |
| Dutch Flats Urban Village[2] | CO-3-1 | 50 feet |
| | CC-3-6 | 65 feet |
| | RM-3-8 | 50 feet |
| Camino Del Rio District | CC-1-3 | 45 feet |
| | CC-3-1 | 50 feet |
| | CC-3-8 | 100 feet |
| Channel District | RM-3-8 | 50 feet |
| | CC-3-6 | 65 feet |
| | CC-4-5 | No Limit |
| Rosecrans District | CC-1-3 | 45 feet |
| | CC-3-6 | 65 feet |
| | RM-3-8 | 50 feet |
| Cauby District | CC-1-3 | 45 feet |
| | CC-3-7 | 65 feet |
| | RM-3-8 | 50 feet |
| Lytton District | CN-1-6 | 65 feet |
| | RM-1-1 | 30 feet |
| | RM-3-8 | 50 feet |
| Kurtz District[2] | CO-3-1 | 50 feet |
| | CC-2-5 | 100 feet |
| | CC-3-8 | 100 feet |
| | IP-2-1 | No limit |
| Hancock Transit Corridor | CC-2-5 | 100 feet |
| | CC-3-8 | 100 feet |
| | RM-3-9 | 60 feet |
| | CC-3-9 | No limit |
| | RM-4-10 | No limit |
| Kettner District | CC-3-8 | 100 feet |
| | IS-1-1 | No limit[3] |
| MCRD[4] | None | None |

Source: City of San Diego 2018, 2022.

Notes: MCRD = Marine Corps Recruit Depot; SDMC = San Diego Municipal Code

[1] CC = Commercial – Community; CN = Commercial-Neighborhood; CO = Commercial-Office; IP = Industrial – Park; IS = Industrial – Small Scale; RM = Residential-Multifamily

[2] Includes Naval Base Point Loma, which does not have a zoned height limit. The highest intensity scenario (Alternative 4) identified under the Navy Old Town Campus Revitalization Project Environmental Impact Statement proposes buildings of up to 350 feet in height. The Coastal Height Limit does not apply to federal, state, or San Diego Unified Port District (Port) property, and the City has no land use authority over federal property (i.e., Naval Base Point Loma).

[3] Includes Port-owned lands regulated by the Port Master Plan, which requires that structures shall not exceed 130 feet in height. The Coastal Height Limit does not apply to federal, state, or Port property, and the City has no land use authority over Port property.

[4] The MCRD does not have a zoning designation; therefore, there is no height limit governing this area. The Coastal Height Limit does not apply to federal, state, or Port property, and the City has no land use authority over federal property (i.e., the MCRD).

14



Source: City of San Diego 2022; SanGIS Imagery 2017.

**Harris & Associates**

N

0    1,000    2,000
Feet

**Figure 3-1**
Maximum Allowable Building Height

The key views presented in the 2022 SEIR show examples of the visual impact these buildings will have.  We include a few of these examples:





Source: Estrada 2022.

**Figure 5.1-3**
Key View 2 - View South from Fiesta Island

16

Existing Conditions



Buildout Scenario



Source: Estrada 2022.

**Figure 5.1-4**
Key View 3 - View Southeast from Old Sea World Drive

**Harris & Associates**

17





Source: Estrada 2022.

**Figure 5.1-6**

Key View 5 - View Southeast from San Diego River Trail

**Harris & Associates**

Yet, the initial study did *not* consider other environmental impacts of such large buildings within the Midway-Pacific Highway area or the surrounding areas. The initial study did not include sufficient detail to allow the decisionmakers and the voters "to consider meaningfully the issues raised by the proposed project." (*Laurel Heights, supra*, 47 Cal.3d at p. 405.)

The City's discretion to determine how to evaluate potentially significant impacts does not extend to defining away significant impacts by narrowly characterizing "build out" based on the number of dwelling units and then analyzing only impacts from that number of units while excluding

other reasonably foreseeable effects of structures above 30 feet. By doing so, the City prejudicially abused its discretion in certifying the 2022 SEIR and the ballot measure. "An omission in an EIR's significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

2.  *Examples of the Inadequate Analysis*

We discuss a few nonexhaustive examples of how the initial study and the SEIR failed to consider potential significant environmental impacts of substantially taller buildings in the Midway-Pacific Highway area.

a.  *Noise*[5]

According to the PEIR and its supporting noise technical report, "[s]ound propagation (i.e., the passage of sound from a noise source to a receiver) is influenced by several factors, including distance from the source, geometric spreading, ground absorption, atmospheric effects, as well as shielding by natural and/or man-made features." The supporting noise technical report explained that noise generally decreases as the distance from

---

[5]   Noise is unwanted, disturbing, or objectionable sound. Noise sensitive receptors include not only humans who are engaging in activities of daily living such as sleeping, reading, talking, or convalescing, but also animals and birds and their habitats.

Vibrations, which are energy waves transmitted through mass, are considered with a noise analysis because they can cause human annoyance as well as property damage at certain levels. Transportation and construction activities are typical outdoor sources of perceptible groundborne vibrations. Vibrations, which also typically diminish with distance from a source, can "under certain circumstances" be "amplified due to structural resonances of the floors and walls."

19

the noise source increases. But reduction in noise depends on important factors such as "ground absorption, atmospheric effects and refraction, shielding by natural and man-made features, noise barriers, diffraction, and reflection."[6]

Terrain features, including buildings, can significantly alter noise levels. Noise attenuation depends on the size of the object and the frequencies of the noise levels. A row of buildings, for example, may reduce traffic noise levels for receptors in subsequent rows of buildings, but it depends on building sizes, building spacing, and site geometry. (Cal. Dept. of Transportation, Technical Noise Supplement to the Caltrans Traffic Noise Analysis Protocol (2013) p. 2-35.)

Noise in the Midway-Pacific Highway area is predominantly from transportation sources: vehicular road traffic, aircraft, and rail operations. Stationary noise sources are from typical industrial, commercial, and infrastructural facilities operations.

The initial study's noise analysis said removal of the height limit "would not result in a change to total allowable density buildout in the [MPH

---

[6]    Diffraction is the modification or bending of a wave (such as a sound wave) around an object in its path. (Webster's 3d New Internat. Dict. (2002) p. 630; see also Cal. Dept. of Transportation, Technical Noise Supplement to the Caltrans Traffic Noise Analysis Protocol (2013) pp. 2-38, 8-4.)

Reflection is the partial or complete return of a sound wave from a surface it encounters. (Webster's 3d New Internat. Dict. (2002) p. 1908; see also Cal. Dept. of Transportation, Technical Noise Supplement to the Caltrans Traffic Noise Analysis Protocol (2013) pp. 8-13 to 8-14.)

Refraction is the bending of sound waves in arcing curves depending upon height above the ground, wind velocity, and changes in temperature. (Cal. Dept. of Transportation, Technical Noise Supplement to the Caltrans Traffic Noise Analysis Protocol (2013) p. 8-14.)

CPU] area; would not change the underlying base zone regulations, including the base zone's height limit; and would not allow development to extend beyond the footprint analyzed in the 2018 PEIR."  The initial study concluded traffic associated with removing the height limit would not be greater than the traffic *volume* previously analyzed in the PEIR and allowable types of noise sensitive land uses would be the same.  Thus, the initial study determined removal of the height limit "would not result in any new significant environmental effects or a substantial increase in the severity of previously identified significant effects regarding increases in ambient noise levels."

The initial study's focus on traffic volume based on the number of dwelling units obscures the fact that the PEIR did *not* analyze how building heights of any size will impact ambient noise levels, let alone heights exceeding 30 feet.

The noise assessment for the PEIR measured ambient noise levels only from areas *within* the Midway-Pacific Highway area.  It identified vehicular traffic on surrounding freeways and local roadways as the dominant existing noise source within the MPH CPU.  Increases in average daily traffic volumes would have the greatest potential to affect noise-sensitive receivers.

The PEIR assumed flat topography throughout the Midway-Pacific Highway area.  It did "not consider attenuation provided by existing structures, topography, or dense vegetation" when analyzing traffic noise generated by roadways or railways.  Future community noise equivalent level contours predicted the highest decibels would be near the surrounding freeways and main roadway arteries.

The PEIR determined increased traffic in the Midway-Pacific Highway area would significantly increase future ambient noise levels within the area

21

on several road segments.  However, the PEIR assumed existing freeway noise would still dominate the ambient noise on at least two of these roadway segments.  It concluded the change in noise level from increased traffic on the two streets would be imperceptible to the human ear when combined with the existing freeway noise.[7]

The initial study did not explain how tall buildings along the freeways and within the Midway-Pacific Highway area will impact ambient noise levels from increased traffic within the area.  Actual noise levels depend upon not only the source noise level, "but also the nature of the sound path from the source to the sensitive receptor."  Structures or terrain can alter noise levels depending on circumstances.

Large buildings may shield freeway noise to some extent for sensitive receptors within the Midway-Pacific Highway area depending on spacing. But they may also reflect or refract ambient noise from sources within the area.  This could increase perceptible noise for sensitive receptors.  If previously dominant freeway noise is attenuated by buildings along the freeway, what impact will traffic volume increases have on receptors within the Midway-Pacific Highway area?  And what role will reflection and refraction play in the ambient noise levels within the area?

The initial study also did not consider how large buildings along the freeways will interact with aircraft noise from the nearby airport and what impact that will have on noise-sensitive land uses within the Midway-Pacific Highway area.  Without analysis, the initial study simply stated allowable noise-sensitive land use types and "exposure to aircraft noise would remain

_____

[7]    One road would have a significant impact on future noise-sensitive receptors in ministerial projects where there is no mechanism to ensure exterior noise levels are appropriately attenuated.

the same" as described in the PEIR. The initial study concluded impacts from airport noise would be less than significant if future projects comply with the General Plan Noise Element and the Airport Land Use Compatibility Plan to attenuate interior noise. But the initial study did not consider the significant change from flat topography to buildings of 100 feet or higher along the boundaries of the Midway-Pacific Highway area and more tall buildings throughout the area. It did not consider whether those structures will impact the perception of airport noise.

Additionally, there is no analysis of how the presence of large buildings may impact human and biological noise-sensitive receptors in the *surrounding* areas. Neither the initial study nor the SEIR considered what noise impacts buildings 100 feet and higher lining the freeways around the Midway-Pacific Highway area will have across the freeways based on reflection or refraction of freeway and rail noise.

" '[A]n EIR may not ignore the regional impacts of a project proposal, including those impacts that occur outside of its borders." (*Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 107.) And an agency may not "employ a methodological approach in a manner that entirely forecloses consideration of evidence showing impacts to the neighboring region." (*Ibid.*)

Finally, the initial study also failed to consider the noise and vibration impacts of constructing buildings taller than 30 feet. After repeating the statement that removing height restriction "would not result in a change to total allowable density buildout" and "would not change the underlying base zone regulations, including the base zone's height limit" the initial study said, "[s]imilar construction types and methods would occur with implementation of the project as were identified for the 2018 Community Plan." But the 2018 Community Plan did *not* consider construction types or methods for

23

buildings higher than 30 feet (particularly buildings of 100 feet or more) because it assumed the Coastal Zone height limit applied.

The SEIR included a Mitigation Monitoring and Reporting Program, which carried forward several potentially significant impacts with corresponding mitigation measures from the PEIR. One potentially significant construction impact was pile driving within certain distances to identified sensitive structures or receivers. Vibrations and groundborne noise from construction, such as pile driving, can cause significant impacts in the form of both annoyance and potential damage. The mitigation measures were to be implemented on a project-by-project basis.

Carrying forward potential construction noise and vibration impacts from the PEIR without considering the impacts of constructing buildings higher than 30 feet is inadequate. It is reasonable to assume constructing the foundations of buildings hundreds of feet high will require different measures than buildings limited to a height of 30 feet. For example, according to a seismic and geologic technical report prepared for the MPH CPU, ground improvement and structural design are basic measures to mitigate liquefication concerns. For heavy structures, deep caissons or pile foundations may be necessary to penetrate through liquefiable material.[8]

Construction of buildings taller than 30 feet presumably will require more extensive ground improvement and structural support. But the initial

---

[8] "Liquefaction-induced ground failure can involve a complex interaction among seismic, geologic, soil, topographic, and groundwater factors. Failures can include ground fissures, sand boils, ground settlement, and loss of bearing strength, buoyancy effects, ground oscillation, flow failure, and complex lateral spread landslides." "Liquefaction areas have potential land use constraints and liquefaction assessments must be made for important projects. The depth and intensity of study will naturally vary depending on the location, type, and importance of the project."

study does not discuss whether the previously identified mitigation measures would adequately address noise and vibration impacts of constructing numerous large buildings throughout the Midway-Pacific Highway area. Therefore, there is no substantial evidence to support the bald conclusion that removal of the height limit would not result in any new significant environmental effects regarding construction noise and vibration.

### b. *Air Quality*

The initial study stated air quality issues were adequately examined in the PEIR, specifically whether: (a) the project (removal of the height limit) will conflict with or obstruct implementation of the air quality plan for the San Diego Air Basin, (b) the project will result in a violation of any air quality standard or contribute substantially to an existing or projected air quality violation, (c) the project will expose sensitive receptors to substantial pollutant concentrations, including toxins, or (d) the project will create objectionable odors affecting a substantial number of people. In each category, the initial study repeated: "[t]he removal of the 30-foot height restriction would not result in a change to total allowable density buildout in the CP area and would not change the underlying base zone regulations, including the base zone's height limit."

The initial study relied on the models and analysis from the PEIR. Removal of the height limit would not conflict with the air quality plan, the initial study declared, because "the project would not change the total construction and operational emissions from buildout in the CP area" and "[e]missions and impacts would be the same as those analyzed in the 2018 PEIR." Traffic would not be greater than previously analyzed in the 2018 PEIR and total construction and operational emissions from "buildout" would be the same so there would be no new or increased violation of air

25

quality standards. "[V]ehicle trip generation and toxic air contaminant concentrations associated with construction and operation would remain the same as those analyzed in the 2018 PEIR" so there would be no new or increased exposure to substantial pollutant concentrations. Assuming removal of the height limit would "generate the same types of odor emissions evaluated in the 2018 PEIR" for construction and operations, the removal of the height limit would not result in any new or increased significant effects regarding odors.

In each category, however, the initial study failed to consider how taller buildings (100 feet or higher) along the freeway boundaries of the Midway-Pacific Highway area and taller buildings throughout the area (ranging from 30 to 65 feet) will interact with air flow or other atmospheric conditions that help dissipate emissions or odors. The initial study's reliance on the 2018 PEIR's analysis of each air quality issue is fundamentally inadequate because the PEIR did not consider the impacts of building heights above 30 feet. (*Save Our Access, supra*, 92 Cal.App.5th at p. 861.)

The PEIR explained how the climate around the Midway-Pacific Highway area is influenced by its proximity to the Pacific Ocean as well as the Pacific high pressure zone, which produces "prevailing westerly to northwesterly winds" which "tend to blow pollutants away from the coast toward the inland areas." These winds are often interrupted by Santa Ana conditions, which send strong, steady, hot, and dry winds over the mountains from the Nevada and Utah areas out to sea.

The fluctuations in the strength and pattern of winds as well as temperature inversions "influence the dispersal or containment of air pollutants" in the Midway-Pacific Highway area. Major factors affecting air pollutant dispersion in the area are "wind speed and direction, the vertical

26

dispersion of pollutants (which is affected by inversions), and the *local topography*." (Italics added.) The occurrence and severity of odor impacts similarly depend on factors such as the nature, frequency, and intensity of the source along with wind speed and direction.

The 2018 Air Quality Technical Study explained, "Concentrations of air pollutants are determined by the rate and location of pollutant emissions released by pollution sources, and the atmosphere's ability to transport and dilute such emissions. Natural factors that affect transport and dilution include *terrain*, wind, and sunlight. Therefore, ambient air quality conditions within the local air basin are influenced by such . . . factors as *topography*, meteorology, and climate*, in addition to the amount of air pollutant emissions released by existing air pollutant sources." (Italics added.)

The PEIR analyzed air quality based on then existing physical conditions, meaning low-lying topography with buildings generally limited to 30 feet. The modeling data for emissions from the proposed MPH CPU operations assumed the same wind speeds and midrise apartment buildings as was assumed for the *prior* adopted plan, which was also limited to 30 feet. The only difference for the MPH CPU was an increase in the number of dwelling units.

The PEIR identified two roadway intersections with the potential to cause localized significant air quality impacts (i.e., carbon monoxide hotspots) due to heavy congestion and longer queues at traffic signals, but it determined the number of vehicle trips would not exceed reference emission thresholds from other cities. The PEIR determined construction activities would not expose sensitive receptors to substantial toxic air contaminant concentrations "due to the highly dispersive nature of diesel particulate matter and the fact that construction activities would occur intermittently at

various locations" over the implementation period.  For odors, the 2018 PEIR presumed construction odors would also disperse rapidly with distance from the source based on typical construction techniques.

The 2018 modeling data did *not* consider how tall buildings in and around the Midway-Pacific Highway area could influence dispersal of predicted emissions or odors.  As one commentator said in opposition to the 2022 ballot measure, "the height limit protects more than views."  It also protects "air circulation."  Neither the initial study nor the SEIR considered whether buildings taller than 30 feet throughout the area will impact air circulation or dispersal rates and, in turn, whether that could change the air quality analyses.

Reliance on the 2018 PEIR for evaluation of total construction emissions is also questionable.  Save Our Access submitted an expert opinion from an environmental consulting firm opining the SEIR failed to consider or evaluate the air quality and greenhouse gas impacts of increased building heights.  The expert report posited that even if removing the height limit would not increase the number of *dwelling units* in the Midway-Pacific Highway area, "future land use developments would require additional building materials and generate more construction activities, requiring longer construction durations, additional off-road equipment, and larger surface areas to be painted."  Additionally, "larger building areas may result in higher energy impacts from increased electricity demand due to additional lighting and larger volumes of air to [be] heated and cooled by HVAC systems."  Therefore, the experts found the initial study's "claim that 'the project would not change the total construction and operational emissions from buildout in the [MPH CPU] area' to be incorrect."  The experts believed further air quality and greenhouse gas analyses should be prepared to

consider whether constructing and operating buildings greater than 30 feet in height throughout the Midway-Pacific Highway area will increase emissions. The initial study failed to explain how constructing buildings higher than 30 feet, and many greater than 100 feet, will not result in greater total construction and operational emissions than buildings limited to 30 feet even if the number of dwelling units is the same.

Without meaningful information about how changes in topography from removing the building height limit will influence air quality issues or levels of pollutants within that changed topography, neither the City decisionmakers nor the public could make informed decisions about removing the height limit or what measures may be taken to mitigate any adverse impacts.

### c. *Biological Resources*

The initial study also said potential adverse impacts to biological resources were adequately examined by the PEIR by repeating, "removal of the 30-foot height restriction would not result in a change to total allowable density buildout in the [MPH CPU] area; would not change the underlying base zone regulations, including the base zone's height limit; and would not allow development to extend beyond the footprint analyzed in the 2018 PEIR." The initial study concluded removal of the height limit would not result in new or increased direct or indirect impacts to sensitive species or vegetation inhabiting the San Diego River, to the wildlife corridor along the river, or to habitat conservation plans because development of the Midway-Pacific Highway area would not extend north of the Interstate 8 and future development projects would be subject to the City's guidelines to address indirect effects on the San Diego River.

The PEIR acknowledged some protected bird species may nest in existing ornamental trees within the Midway-Pacific Highway area, but it said future discretionary development would require preconstruction surveys to determine the presence or absence of breeding birds to ensure construction would not impact nesting birds or their chicks.

The PEIR also recognized the San Diego River functions as an important local and regional wildlife corridor, but it did not believe significant direct or indirect impacts to these corridors would occur with the development as proposed in the MPH CPU. It relied on future compliance with the City's guidelines during development review of site-specific projects to mitigate indirect impacts to a multi-habitat planning area adjacent to development. These guidelines are intended to address drainage, toxics, lighting, noise, barriers, invasive species, brush management, and grading/development.

The PEIR based its impact analysis on existing low, flat land conditions along the San Diego River. It focused only on the Midway-Pacific Highway area plus a 500-foot buffer. It did not conduct field work. It analyzed existing databases and literature.

The PEIR acknowledged that potential indirect impacts on biological resources could include noise, changes in hydrology from runoff and sedimentation, introduction of exotic and predator species, artificial night lighting, dust, and unauthorized access. Elevated ambient noise levels "have potential to disturb species and/or cause direct habitat avoidance." For example, noise can interfere with species, such as birds, that rely on sound to communicate. Development can introduce exotic plant or animal species to areas adjacent to a multi-habitat planning area that could indirectly impact native species. Artificial night lighting can impact nocturnal species by

30

modifying predation rates, obscuring lunar cycles, or causing habitat avoidance.  It can also disturb diurnal species roosting in an adjacent habitat.

The initial study did not consider whether a significant change in topography through the introduction of buildings taller than 100 feet along Interstate 8 and adjacent to the San Diego River will change or exacerbate potential impacts on biological resources identified in the 2018 PEIR.  Nor did the initial study consider potential impacts of numerous buildings higher than 30 feet throughout the Midway-Pacific Highway area on biological resources.

Simply repeating the findings of the PEIR without analyzing the potential impacts of removing the height limit in the Midway-Pacific Highway area is inadequate.  Will noise reflected or refracted from taller buildings disturb sensitive species in or adjacent to the Midway-Pacific Highway area?  Will light from rows of buildings near the San Diego River disturb the lunar cycles of sensitive wildlife?  Will numerous tall buildings cause increased runoff that will impact sensitive habitats?  Will changed topography, noise, and light from new building heights fragment and disrupt the recognized wildlife corridor along the San Diego River?

Take, for example, the American Peregrine falcon mentioned in the PEIR as a fully protected species and one of special concern.  The PEIR said there was low potential for the Peregrine falcon to occur in the Midway-Pacific Highway area because the biological study area lacked suitable habitat.  Peregrine falcons tend to nest on cliff ledges as well as "human-made structures such as buildings [and] cranes."  Neither the initial study nor the SEIR considered how tall buildings throughout the Midway-Pacific Highway area may impact Peregrine falcons.  If man-made structures draw this species (or others) to the area for nesting, will the project otherwise

31

impact them?  Will their presence have an impact on the ecological balance of nearby sensitive species and lands, either for better or for worse?  The initial study and the SEIR did not consider these or other such potential impacts.

   d. *Geological Conditions*

  The Midway-Pacific Highway area is largely underlain by artificial fill and young alluvial deposits, which are susceptible to liquefication, settlement, dynamic consolidation, slope instability, and poor foundation characteristics.  The PEIR said groundwater levels, which are expected to be near sea level throughout most of the Midway-Pacific Highway area, "can change in response to changes in precipitation and runoff."  As a result, the PEIR recognized most of the Midway-Pacific Highway area has "a high potential for liquefication" because the area has "shallow groundwater, major drainages, and hydraulic fills."

  The PEIR stated future projects would be required to prepare geotechnical investigations for site-specific recommendations.  It determined potential impacts from seismic hazards, erosion, geologic instability, and expansive soils would be less than significant if proposed site-specific projects comply with existing codes and standards.

  The initial study carried forward these comments and stated there would be no or less than significant geological impacts if site-specific projects comply with building codes and standards.  It repeated the mantra that removal of the height limit would not change allowable density buildout and would not change "the underlying base zone regulations, including the base zone's height limit."

  However, the initial study did not consider whether constructing tall buildings 100 feet or more along the freeways and up to 65 feet throughout the Midway-Pacific Highway area will change the geological analysis.  A

32

person commenting in opposition to the second ballot measure said the 2022 SEIR did not consider rising sea levels, higher groundwater levels and liquefication. "[A]ny time groundwater level is high, and you add high buildings on top of that, it is impossible to have solid bedrock foundations."

How will building foundational support for numerous tall buildings in the area impact the geological conditions collectively? Will they cumulatively impact hydrology and water quality, such as groundwater? Neither the initial study nor the 2022 SEIR address such questions.

3. *Deferring Environmental Analysis to Site-specific Projects Is Inadequate*

Throughout the initial study, largely relying on language from the PEIR, the City commented that potential environmental impacts would be less than significant if site-specific projects comply with various City regulations and standards.

For example, the initial study assumed traffic noise impacts will be less than significant if future discretionary development projects will comply with an existing regulatory review process to demonstrate the project will be compatible with City noise level standards. Site-specific discretionary projects must demonstrate it will not place sensitive receptors in locations where exterior existing or future noise levels would exceed the noise compatibility guidelines or, if the exterior noise levels would exceed those thresholds, demonstrate it will comply with interior noise compatibility guidelines.[9]

---

9     The initial study acknowledged that there is no mechanism to enforce compliance with such noise standards for ministerial projects. Therefore, it concluded, vehicle noise exposure would result in significant and unavoidable impacts for ministerial projects.

Deferring analyses and mitigation measures to site-specific discretionary development projects to comply with an existing regulatory framework is inadequate when considering a significant change to an entire area at a program level. The Guidelines authorize tiering, but they advise that "[a] program EIR will be most helpful in dealing with later activities if it provides a description of planned activities that would implement the program and *deals with the effects of the program as specifically and comprehensively as possible*." (Guidelines, § 15168, subd. (c)(5), italics added.) Tiering is only appropriate for unspecified and uncertain future projects where it would be speculative to consider the environmental consequences now. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 503.) A significant environmental impact is ripe for evaluation in a first-tier EIR when the agency has "sufficiently reliable data . . . to permit preparation of a meaningful and accurate report on the impact." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1028.)

Here, the City had sufficiently reliable data to produce renderings of how buildings over 30 feet would visually impact the Midway-Pacific Highway area. It similarly has sufficiently reliable data to prepare a meaningful and accurate report analyzing how such buildings may impact both the environment within the Midway-Pacific Highway area and the environment of the surrounding areas. A meaningful analysis of the potential environmental impacts of removing the height limit for an entire area, which is a significant change at the program level, is particularly important if recent legislation may now exempt certain site-specific projects within the MPH CPU from further CEQA review or subject those projects to a streamlined process. As Save Our Access stated in one of its comment

34

letters, "San Diegans deserve to know the complete picture" of removing the 30-foot Coastal Zone height limit.  We agree that CEQA requires as much.

IV.

DISPOSITION

The judgment is reversed.  The matter is remanded with directions for the superior court to grant the petition for writ of mandate and direct the City to comply with CEQA.  Appellant shall recover their fees and costs on appeal.

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

RUBIN, J.